## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928

This Document Relates to:

*Caruso, et al.* v. *Bayer Corp., et al.*,
Case No. 9:08-cv-80639

_____/

### BAYER'S MOTION FOR SUMMARY JUDGMENT AGAINST
### PLAINTIFF WILLARD CHAPPELL AND TO EXCLUDE TESTIMONY OF
### HIS EXPERTS CARL J. BLOND AND ARTHUR C. HILL,
### AND COMBINED MEMORANDUM OF LAW IN SUPPORT

Pursuant to Rule 702 of the Federal Rules of Evidence, defendants Bayer

Corporation, Bayer HealthCare Pharmaceuticals Inc., and Bayer Schering Pharma AG (as

successor in interest to Bayer HealthCare AG) (collectively, "Bayer") move to exclude the

testimony of  specific causation experts Carl J. Blond, M.D. and Arthur C. Hill, M.D.  Because

plaintiff Willard Chappell has no admissible expert testimony on causation and no evidence that

Trasylol's allegedly inadequate warnings proximately caused his renal failure, Bayer moves for

summary judgment pursuant to Federal Rule of Civil Procedure 56.[1]

### MEMORANDUM OF LAW

On September 8, 2007, Willard Chappell, then 74 years old, reported to the

emergency room complaining of shortness of breath and chest pain, with a history of coronary

_____

[1] Plaintiffs Raul Reyes, Lisa Powers (for Francis Powers), and Willie Saddle have been
dismissed.  Bayer has filed an unopposed motion to stay *Daubert* and dispositive motion briefing
as to plaintiff Roseann Caruso [D.E. 6227 in 1:08-md-1928; D.E. 91 in 9:08-cv-80639], pending
a ruling on her motion to substitute an expert witness.  The motion to substitute is fully briefed.
*See* Motion [D.E. 5940 in 1:08-md-1928; D.E. 85 in 9:08-cv-80639], Opposition [D.E. 6129 in
1:08-md-1928; D.E. 88 in 9:08-cv-80639], and Reply [D.E. 6199 in 1:08-md-1928; D.E. 89 in
9:08-cv-80639].

artery disease with previous angioplasty, congestive heart failure, chronic renal insufficiency, insulin-dependent diabetes, hypertension, chronic obstructive pulmonary disease ("COPD"), obesity, and tobacco abuse.  Over the next four days, Mr. Chappell was evaluated by a cardiology consultant and underwent a left heart catheterization.  During this time, his serum creatinine level (one measure of renal function) rose from 1.9 to 2.3, well above the normal range of 0.7-1.3.  Based on the catheterization results, coronary artery bypass surgery was recommended.  Because Mr. Chappell's medical history placed him at an increased risk of bleeding, his surgeon used Trasylol in the 131-minute procedure.  The Trasylol worked, and Mr. Chappell did not experience post-operative bleeding.

On September 15, 2007, two days after his surgery, Mr. Chappell's serum creatinine level began to escalate again.  When his creatinine level reached 3.9 on September 19, he was placed on dialysis.  He was later transferred to an extended care facility, where he remained dialysis dependent.   Despite Mr. Chappell's significant pre-existing renal impairment and risk factors, plaintiff claims that Trasylol caused his renal failure.

Bayer is entitled to summary judgment for three independent reasons.  *First*, plaintiff cannot show that the Trasylol warning was inadequate because, at the time of his surgery, the product insert explicitly warned that Trasylol increased the risk of renal dysfunction, which could progress to renal failure.  *Second*, even if that warning had been inadequate, and it was not, Mr. Chappell's cardiac surgeon testified that he prescribed Trasylol *knowing* of this reported risk.  Plaintiff therefore cannot establish that any alleged deficiency in the warnings proximately caused Mr. Chappell's injury.  *Third*, plaintiff has no admissible evidence that Trasylol was the cause-in-fact of his renal failure.  Mr. Chappell's treating cardiac surgeon testified that Trasylol *did not cause* his injuries.  Plaintiff's entire causation case therefore rests

on the testimony of hired experts, Dr. Carl Blond and Dr. Arthur Hill, whose testimony must be excluded because it is not supported by a scientifically reliable differential diagnosis.

Bayer also is entitled to summary judgment on any claims purportedly based on non-warnings theories because those claims fail as a matter of law for the additional reasons detailed below. Because plaintiff has no evidence of proximate causation and no admissible evidence of causation-in-fact, Bayer is entitled to summary judgment as a matter of law.

## BACKGROUND

**A.      Mr. Chappell's Medical History.**

Mr. Chappell was in poor physical health long before he received Trasylol, and it is undisputed that these pre-existing conditions and the surgery itself increased his risk of post-operative renal failure. Indeed, plaintiff's own expert estimated Mr. Chappell's risk of renal failure requiring dialysis as 34 percent, with the risk of major complications including both morbidity and mortality at 40 percent. Deposition of Arthur Hill, M.D. ("Hill Dep.") (Ex. A)[2] at 138:6-15. Mr. Chappell's risk factors included:

- *Diabetes*. Mr. Chappell suffered from type 2 insulin-dependent diabetes for at least twelve years before his surgery. Plaintiff Fact Sheet ("PFS") (Ex. B) § IV.F; Deposition of Carl J. Blond, M.D. ("Blond Dep.") (Ex. C) at 33:21-24, 109:22-24. Diabetes is a risk factor for post-operative renal failure. Blond Dep. (Ex. C) at 33:16-20; Deposition of Dr. Michael Gibson, M.D. ("Gibson Dep.") (Ex. D) at 37:18-38:1, 68:21-24; Hill Dep. (Ex. A) at 88:25-89:13; 93:17-21.

- *Chronic Renal Insufficiency*. Mr. Chappell had what his own expert characterized as "stage 3 chronic kidney disease" during the three months before his CABG surgery. Blond

---

[2] Exhibits referenced herein are attached to Bayer's Statement of Material Facts Pursuant to Local Rule 7.5.C filed concurrently.

Dep. (Ex. C) at 52:19-53:8.  During the time between his admission to the hospital and his

surgery, Mr. Chappell's creatinine level rose further, placing him at stage four chronic kidney

disease.  *Id.* at 57:20-58:3; Gibson Dep. (Ex. D) at 43:1-44:18 (before surgery, Mr. Chappell's

creatinine level was 2.2, significantly above the normal range of 0.7-1.3).  Pre-existing kidney

disease is a major risk factor for post-operative renal failure, and that risk increases with the

severity of the pre-existing illness.  Blond Dep. (Ex. C) at 34:14-25; Gibson Dep. (Ex. D) at

44:10-18; Hill Dep. (Ex. A) at 90:15-91:13, 94:1-5.  Rising serum creatinine levels occurring

during the week before surgery can also be a risk factor for renal failure following surgery.

Blond Dep. (Ex. C) at 41:1-7; Hill Dep. (Ex. A) at 97:23-98:3.

•        *Acute Myocardial Infarction and Congestive Heart Failure*.  Mr. Chappell

suffered a myocardial infarction (heart attack) less than a week before his CABG surgery.  Blond

Dep. (Ex. C) at 36:7-11; Hill Dep. (Ex. A) at 91:20-23.  Moreover, he was "in congestive heart

failure when he was admitted to the emergency room."  Hill Dep. (Ex. A) at 91:24-92:6, 115:24-

116:4; *see also* Blond Dep. (Ex. C) at 37:3-10; 51:2-12.  Both a recent heart attack and

congestive heart failure are recognized risk factors for post-operative renal failure.  Blond Dep.

(Ex. C) at 35:1-21; 36:23-37:2; Gibson Dep. (Ex. D) at 69:4-13; Hill Dep. (Ex. A) at 91:14-92:6;

94:6-16.

•        *Hypertension*.  Long before his surgery, Mr. Chappell suffered from hypertension.

His own expert characterized Mr. Chappell's blood pressure control as "fair to poor" and not

"well-controlled."  Blond Dep. (Ex. C) at 46:8-17.  Hypertension can increase the likelihood of

post-operative renal failure.  *Id*. at 38:5-12; Gibson Dep. (Ex. D) at 38:13-39:8, 69:18-22; Hill

Dep. (Ex. A) at 94:25-95:6.  Three days before his hospital admission, Mr. Chappell ran out of

his hypertension medications, resulting in severe hypertension, which his own expert described

as an "insult" to the kidneys.  Blond Dep. (Ex. C) at 50:4-51:1; *see also* Gibson Dep. (Ex. D) at 39:9-40:18 (Chappell was admitted with "acute, uncontrolled hypertension" and a "[s]everely elevated" blood pressure); Hill Dep. (Ex. A) at 106:3-17, 110:8-111:8 (blood pressure on admission to St. Luke's was "quite high" and hypertension was "severe").

- *Ejection Fraction of 45 Percent or Less*.  An ejection fraction (the fraction of blood pumped out of a ventricle with each heart beat) of 45 percent or less is a risk factor for renal failure.  Blond Dep. (Ex. C) at 33:25-34:13; Gibson Dep. (Ex. D) at 37:2-10, 68:16-20; Hill Dep. (Ex. A) at 89:14-90:14; 93:22-25.  At the time of his surgery, Mr. Chappell had a left ventricle ejection fraction of between 40 and 45 percent.  Blond Dep. (Ex. C) at 33:25-34:13.

- *Prolonged Time on Cardiopulmonary Bypass*.  During his CABG surgery, Mr. Chappell was on cardiopulmonary bypass for 2.25 hours.  Expert Report of Carl J. Blond, M.D. ("Blond Report") (Ex. E) at 3.  Spending more than two hours on a bypass machine is another risk factor for post-operative renal failure.  Blond Dep. (Ex. C) at 41:8-20; Gibson Dep. (Ex. D) at 66:12-68:15; Hill Dep. (Ex. A) at 98:20-101:10.

- *Catheterization with Nephrotoxic Dye*.  Two days before his CABG surgery, Mr. Chappell underwent a cardiac catheterization using a nephrotoxic contrast agent that can cause an increase in serum creatinine levels.  Blond Dep. (Ex. C) at 41:21-45:5; Hill Dep. (Ex. D) at 101:11-20.  Diabetes, hypertension, and renal insufficiency, from which Mr. Chappell suffered, place patients at an increased risk of renal injury due to the contrast agent.  Blond Dep. (Ex. C) at 45:6-10; Hill Dep. (Ex. A) at 102:21-103:11.  Moreover, the risk of renal failure following CABG surgery escalates when, as here, the cardiac catheterization is performed within five days of the surgery.  Blond Dep. (Ex. C) at 45:11-20; Hill Dep. (Ex. D) at 96:18-97:10.

- *Chronic Obstructive Pulmonary Disease*.  Well before his surgery, Mr. Chappell suffered from COPD.  Blond Dep. (Ex. C) at 37:20-38:4; Hill Dep. (Ex. A) at 94:22-24.  COPD is a risk factor for post-operative renal insufficiency.  Blond Dep. (Ex. C) at 37:11-24; Hill Dep. (Ex. A) at 94:17-21.

- *Morbid Obesity*.  Mr. Chappell was morbidly obese, another risk factor for renal failure post-surgery.  Blond Dep.(Ex. C)  at 38:13-39:16; Gibson Dep. (Ex. D) at 40:19-41:8, 69:14-17; Hill Dep. (Ex. A) at 95:7-96:5 (acknowledging the literature showing obesity is a risk factor for post-operative renal failure and opining that obesity is a marker of underlying conditions that cause renal failure).  At the time of his surgery, the six-foot Mr. Chappell weighed 266 pounds.  Plaintiff Fact Sheet (Ex. B) §§ IV.A-B.

- *Tobacco Abuse*.  Mr. Chappell smoked five packs of cigarettes per day until approximately a decade before his surgery, a practice that increased his risk of renal failure following surgery.  Blond Dep. (Ex. C) at 37:3-38:4; Hill Dep. (Ex. A) at 116:25-117:6.

- *Prior Angioplasty*.  Mr. Chappell had a prior angioplasty, another risk factor for post-operative renal failure.  Blond Dep. (Ex. C) at 40:16-25; Hill Dep. (Ex. A) at 97:11-22.

- *Age*.  Mr. Chappell's age at the time of surgery, 74, also increased his risk of renal failure following surgery.  Blond Dep. (Ex. C) at 33:8-15; Gibson Dep. (Ex. D) at 68:25-69:3; Hill Dep. (Ex. A) at 88:9-24; 92:21-93:11.

**B.     Mr. Chappell's Surgery and Subsequent Events**

When Mr. Chappell arrived at the emergency room on September 8, 2007, he reported difficulty breathing and presented with a history of heart disease.  Gibson Dep. (Ex. D) at 32:19-33:3; Blond Report (Ex. C) at 2.  His serum creatinine was 1.9, his blood pressure was

6

225/90, and his symptoms were consistent with acute congestive heart failure. Blond Report (Ex. E) at 2.

Three days later, Mr. Chappell underwent a cardiac catheterization, which revealed an ejection fraction of 40-45 percent and severe triple-vessel coronary artery disease. Blond Report (Ex. E) at 2; Gibson Dep. (Ex. D) at 49:2-50:24; 53:17-23. Contrast dye (150 cc) was used during the procedure, and Mr. Chappell's serum creatinine on the day of the catheterization had risen to 2.3. Blond Report (Ex. E) at 2, 4. That same day, Mr. Chappell consulted with cardiothoracic surgeon Dr. Michael Gibson. *Id.* at 2. Dr. Gibson recommended that Mr. Chappell undergo CABG surgery, but cautioned that because of his "significant" heart condition and other underlying conditions, Mr. Chappell faced an increased risk of mortality and other complications. Gibson Dep. (Ex. D) at 52:21-53:16. Moreover, one risk of cardiac surgery itself is renal failure. Blond Dep. (Ex. C) at 32:19-22; Hill Dep. (Ex. A) at 75:20-25, 77:11-20.

Dr. Gibson, who was "very concerned about the potential of renal failure," estimated that Mr. Chappell faced a 35.5 percent risk of renal failure following his surgery. Gibson Dep. (Ex. D) at 74:7-12; 83:18-84:14. Nevertheless, given that Mr. Chappell "was not going to get any better" without the surgery, and that people with his condition "typically die" without surgical intervention, Dr. Gibson concluded that the benefits of surgery outweighed the risk of renal failure. *Id.* at 53:17-23, 57:14-58:5, 59:21-60:9; *see also id.* at 55:17-58:5 (medical management, lifestyle changes, and less invasive options were not viable alternatives given the severity of Mr. Chappell's condition). Mr. Chappell was transferred to St. Elizabeth's Hospital for surgery. Blond Report (Ex. E) at 2. At the time of transfer, his creatinine level was 2.2.

Mr. Chappell underwent CABG surgery on September 13, 2007. Plaintiff Fact Sheet (Ex. B) § V.A; Blond Report (Ex. E) at 3; Expert Report of Arthur Hill, M.D. ("Hill

Report") (Ex. F) ¶ 1.  Preoperative tests showed a serum creatinine of 2.3.  The surgery took longer than most CABG procedures because (a) Mr. Chappell's left ventricle was extremely thick, making it hard to manipulate; (b) his heart had deep myocardial vessels, making it difficult to isolate a specific vessel; and (c) Mr. Chappell weighed 266 pounds.  Gibson Dep. (Ex. D) at 86:4-87:5.  Trasylol was used during the procedure.  *Id.* at 87:11-88:8.

Following the surgery, Mr. Chappell was admitted to intensive care and, on Day 1 post-surgery had a creatinine level of 2.4.  Blond Report (Ex. E) at 3.  On that day, he suffered a stroke, which no expert opines was caused by Trasylol.  Hill Dep. (Ex. A) at 70:12-20; Blond Dep. (Ex. C) at 32:8-14.  On Day 3 post-surgery, Mr. Chappell's creatinine level rose to 3.7; on Day 5, a renal consultant ordered IV fluids; nevertheless, on Day 6, Mr. Chappell's serum creatinine rose to 3.9, so he was placed on dialysis.  Blond Report (Ex. E) at 3; Hill Report (Ex. F) ¶ 7.  He was later discharged to an extended care facility, where he continued on dialysis.  Blond Report (Ex. E) at 3-4.

## ARGUMENT

Plaintiff has no competent evidence to establish two elements of his *prima facie* case:  proximate causation and causation in fact.  Bayer therefore is entitled to summary judgment.  *Haller v. AstraZeneca Pharms. LP,* 598 F. Supp. 2d 1271, 1306 (M.D. Fla. 2009).

## I.  PLAINTIFF CANNOT CREATE A TRIABLE ISSUE ON PROXIMATE CAUSATION.

All of plaintiff's claims turn on allegations that Bayer failed adequately to warn of—or fraudulently misrepresented or concealed—the risk of renal failure associated with Trasylol.  *See* First Amended Complaint [D.E. 232 in 1:08-md-1928; D.E. 20 in 9:08-cv-80639] ("Am. Compl.") ¶¶ 70-140.  To establish a *prima facie* case on these claims, plaintiff must adduce evidence that Bayer failed adequately to warn of this risk and that such failure to warn

proximately caused Mr. Chappell's injuries.  *See, e.g., Stewart v. Gen. Motors Corp.*, 102 Fed.

App'x 961, 993-64 (6th Cir. 2004) (applying Kentucky law).[3]  Plaintiff cannot make either

showing.  Plaintiff cannot demonstrate that the Trasylol warning was inadequate because it

explicitly warned physicians of the harm claimed by plaintiff.  And plaintiff cannot establish that

any failure to warn proximately caused his injuries because his surgeon testified that he

prescribed Trasylol while fully aware of the risk of harm alleged by plaintiff.

**A.**     **The Trasylol Labeling In Effect At The Time Of Mr. Chappell's September 2007 Surgery Was Adequate As A Matter Of Law.**

Plaintiff contends that Bayer failed adequately to warn that Trasylol increases the

risk of renal failure.  Bayer is entitled to summary judgment because the Trasylol label at the

time of Mr. Chappell's surgery warned explicitly, and at length, that Trasylol increased the risk

for renal dysfunction, which could progress to renal failure:

> **WARNINGS**: **Renal Dysfunction**: Trasylol[®] administration
> increases the risk for renal dysfunction and may increase the need
> for dialysis in the perioperative period.  This risk may be especially
> increased for patients with pre-existing renal impairment or those
> who receive aminoglycoside antibiotics or drugs that alter renal
> function.  Data from Bayer's global pool of placebo-controlled
> studies in patients undergoing coronary artery bypass graft
> (CABG) surgery showed that the incidence of serum creatinine
> elevations >0.5 mg/dL above pre-treatment levels was statistically
> higher at 9.0% (185/2047) in the high dose aprotinin (Regimen A)
> group compared with 6.6% (129/1957) in the placebo group.  In
> the majority of instances, post-operative renal dysfunction was not
> severe and was reversible.  However, renal dysfunction may
> progress to renal failure and the incidence of serum creatinine
> elevations >2.0 mg/dL above baseline was slightly higher in the
> high-dose aprotinin group (1.1% vs. 0.8%).  Careful consideration
> of the balance of benefits versus potential risks is advised before

---

[3] Mr. Chappell lives in and had his heart surgery in Kentucky, but filed suit in Connecticut. Under Connecticut choice-of-law principles, the substantive law of the place of injury applies, unless applying that law would "undermine expectations of the parties or an important state policy, produce an arbitrary and irrational result, or where 'reason and justice' counsel for the application of a different principle."  *Abdullahi v. Pfizer, Inc*., 562 F.3d 163, 190 (2d Cir. 2009). Kentucky substantive law applies here.

administering Trasylol® to patients with impaired renal function (creatinine clearance <60 mL/min) or those with other risk factors for renal dysfunction (such as perioperative administration of aminoglycoside or products that alter renal function).  (See **PRECAUTIONS** and **ADVERSE REACTIONS: Laboratory Findings: Serum Creatinine**.)

…

**PRECAUTIONS**:  _Renal Dysfunction_:  Bayer's global pool of placebo-controlled studies in patients undergoing CABG showed aprotinin administration was associated with elevations in serum creatinine values > 0.5 mg/dL above baseline.  Careful consideration of the balance of benefits and risks is advised before administering aprotinin to patients with pre-existing impaired renal function or those with other risk factors for renal dysfunction. Serum creatinine should be monitored regularly following Trasylol® administration (see **WARNINGS: Renal Dysfunction**).

…

**ADVERSE REACTIONS: Laboratory Findings**:  **Serum Creatinine:** Trasylol® administration is associated with a risk for renal dysfunction (see **WARNINGS: Renal Dysfunction**)."

Trasylol Package Insert (revised December 2006) (Ex. G).  The FDA approved this revised Trasylol label in December 2006, approximately eight months before Mr. Chappell's surgery. Moreover, Bayer sent Dr. Gibson a "Dear U.S. Healthcare Professional" letter in February 2006, over a year before Mr. Chappell's surgery, highlighting the Mangano article's finding of "an association of aprotinin with increased risk of … renal dysfunction or failure in patients undergoing CABG surgery" and warning that current FDA guidelines advised "limiting Trasylol use to situations where the clinical benefit of reduced blood loss is essential for medical management of the patient and outweighs potential risks."  February 2006 letter from Bayer Pharmaceuticals Corp. to U.S. Healthcare Professionals (Ex. H); April 17, 2007, email from William Shank to Sales Team (Ex. I) (noting that Bayer sent letter to Dr. Gibson).

Where, as here, a manufacturer's warnings caution against the harm alleged by a plaintiff, a failure-to-warn claim must fail.  *Gibson v. Sanofi-Aventis U.S., LLC*, No. 07-cv-192, 2009 WL 3490454, at *4 (W.D. Ky. Oct. 27, 2009) (holding that, where "the warning concerning

[plaintiff's alleged injury] ha[d] always been included in the product literature," plaintiff could not succeed on failure-to-warn claim); *Foister v. Purdue Pharma, L.P.*, 295 F. Supp. 2d 693, 706-08 (E.D. Ky. 2003) (rejecting failure-to-warn claim where drug's "insert clearly set forth the potential dangers of the drug and the best manner in which to minimize those dangers").  Mr. Chappell's claims against Bayer are indistinguishable from those that supported summary judgment in *Gibson* and *Foister*.  Having warned of the harm on which plaintiff bases his claims, Bayer's warnings were adequate as a matter of law and Bayer is entitled to summary judgment.

      **B.**    **Mr. Chappell's Prescribing Physician Understood that Trasylol Presented the Risk of the Harm Claimed by Plaintiff.**

Even if plaintiff could create a triable issue of fact concerning the Trasylol warning, Bayer would be entitled to summary judgment because plaintiff cannot demonstrate that the allegedly inadequate warning proximately caused his injury.  *Stewart*, 102 Fed. App'x at 964; *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 536 (6th Cir. 1995); *Farmer v. Heard*, 844 S.W.2d 425, 427-28 (Ky. Ct. App. 1992).  In failure-to-warn cases, Kentucky applies the "learned intermediary" doctrine, meaning that the manufacturer has a duty to warn only the prescribing physician.  *Larkin v. Pfizer, Inc.,* 153 S.W.3d 758, 765 (Ky. 2004).  Accordingly, proximate causation, including whether a different warning would have been heeded, is assessed from the vantage point of the prescriber.  *See id; see also Bodie v. Purdue Pharma Co.,* 236 Fed. App'x 511, 520-21 (11th Cir. 2007).

Plaintiff cannot establish proximate causation because he has not demonstrated that his prescribing physician, Dr. Gibson, relied on the warning that plaintiff contends was inadequate.  *First*, Dr. Gibson knew of the risks for renal failure when he decided to prescribe Trasylol for Mr. Chappell.  Dr. Gibson testified that he understood renal failure to be a risk of Trasylol through monitoring the website of the Society of Thoracic Surgeons, Gibson Dep.

(Ex. D) at 97:9-18, and communications with colleagues, *id.* at 97:19-98:7.  Indeed, risk of renal

failure was Dr. Gibson's principal concern in deciding whether to use Trasylol in Mr. Chappell's

surgery.  *Id.* at 93:16-22.  Dr. Gibson reasoned that, because Mr. Chappell faced an elevated risk

of bleeding, the benefits of using Trasylol outweighed the risks.  *Id.* at 53:17-23; 59:21-60:9;

98:8-100:19.  Because Dr. Gibson considered the risk of renal failure and decided to prescribe

Trasylol anyway, plaintiff cannot establish that any inadequacy in the warning about the risk of

renal failure proximately caused Mr. Chappell's injury.  *See Foister*, 295 F. Supp. 2d at 706

(under learned intermediary doctrine, "physician's knowledge" of risks curtails liability); *Larkin*,

153 S.W.3d at 763-4 (same); see also *Bodie*, 236 Fed App'x at 520-21 (where physician had

independent knowledge of risks label should have communicated and chose to prescribe drug

anyway, allegedly inadequate warning was not proximate cause of plaintiff's injury).

   *Second,* plaintiff has no evidence that Dr. Gibson would have heeded a different

warning and not prescribed Trasylol to Mr. Chappell.  To the contrary, Dr. Gibson testified that

he regularly used Trasylol in patients undergoing surgery on cardiopulmonary bypass.  Gibson

Dep. (Ex. D) at 90:5-91:20.  He did not change those prescribing habits following the New

England Journal of Medicine's January 2006 publication of the article by Dr. Mangano—an

article that is central to plaintiff's liability theory, *see, e.g.,* Am. Compl. ¶¶ 27-29—which, as

described by plaintiff's counsel, showed a "more than doubled" risk of renal failure in patients

receiving Trasylol.  Gibson Dep. (Ex. D) at 120:24-121:2; *see also id.* at 92:3-19 (testifying that

he was aware of the Mangano article and the reported increased risk of renal failure before Mr.

Chappell's surgery).  Dr. Gibson testified that he continued to use Trasylol until shortly before

sales were halted and "would still be using it today," if it were available.  *Id.* at 180:20-181:1.[4]

Even now, knowing that Mr. Chappell is on dialysis, Dr. Gibson could "not categorically state"

that he would not prescribe Trasylol for plaintiff.  *Id.* at 180:2-23.  Thus, Mr. Chappell has no

evidence that a purportedly "adequate" warning would have prevented his injury.

## II.    PLAINTIFF HAS NO ADMISSIBLE EVIDENCE OF CAUSATION-IN-FACT.

Summary judgment also should be entered for Bayer because plaintiff has no

admissible evidence that Trasylol was a substantial factor in causing his injuries.  Evidence of

causation-in-fact is required for all of Mr. Chappell's claims.[5]  Moreover, causation testimony

from a medical expert is necessary to withstand summary judgment in a pharmaceutical case.

*See Gibson v. Sanofi-Aventis U.S., LLC*, 2009 WL 3490454, at *7 (W.D. Ky. 2009) (granting

summary judgment where plaintiff presented no admissible expert causation opinion).

Plaintiff has no evidence from Mr. Chappell's treating physician that Trasylol

caused his injuries or death.  To the contrary, Dr. Gibson, Mr. Chappell's surgeon, testified that

---

[4] Dr. Gibson further stated that as of today, he had "not seen anything specific to indicate a significantly increased mortality or renal failure" as a result of Trasylol.  Gibson Dep. (Ex. D) at 176:23-177:23.  Plaintiff tried to challenge this testimony by handing Dr. Gibson two studies and asking him whether, in light of those studies "if you could go back in time to September 13, 2007, you would not administer Trasylol to Mr. Chappell, would you?"  Dr. Gibson replied "Based on the studies set before me, no."  *Id.* at 138:20-139:1.  However, Dr. Gibson later explained  that his response was based solely on the two studies selected by plaintiffs' counsel and not on the full universe of available literature regarding Trasylol.  *See id.* at 180:2-23.  And as noted above, he would still use Trasylol if it were still available today.

[5] *See Martin v. Cincinnati Gas & Elec. Co.,* 561 F.3d 439, 443 (6th Cir. 2009) (under Kentucky law, plaintiff alleging negligent products liability theory must show that defendant's conduct was a substantial factor in bringing about harm); *Greene v. B.F. Goodrich Avionics Systems, Inc.*, 409 F.3d 784, 788-89 (6th Cir. 2005 (same for strict liability); *Morales v. American Honda Motor Co.,* 151 F.3d 500, 507 (6th Cir. 1998) (same for strict liability, negligence, and warranty claims); *Wilson v. Wyeth, Inc.*, No. 07-cv-378, 2008 WL 2677049, at *1 (W.D. Ky. June 30, 2008) (same for all products liability claims, regardless of legal theory); *Craig & Bishop, Inc. v. Piles,* 247 S.W.3d 897, 905 (Ky. 2008) (Kentucky unfair trade practices statute requires that plaintiff's injury be caused by defendant's act); *United Parcel Serv. Co. v. Rickert,* 996 S.W.2d 464, 468 (Ky. 1999) (fraud claims require plaintiff to show causation).

Trasylol *did not* cause plaintiff any injury.  Gibson Dep. (Ex. D) at 110:13-20.  Dr. Gibson

testified that Mr. Chappell's renal failure was caused by his "hypertension, diabetes, and

dyslipidemia and his [i]schemic heart disease."  *Id.* at 44:5-9.

Thus, Mr. Chappell's case rests on the testimony of his two hired causation

experts,[6] nephrologist Carl Blond, M.D. and cardiothoracic surgeon Arthur Hill, M.D., who

opine that Trasylol was a substantial factor in causing Mr. Chappell's renal failure.[7]  Their

testimony should be excluded because they did not attempt to rule out many pre-existing

conditions that could independently have caused Mr. Chappell's renal failure.

### A. Drs. Blond and Hill Failed To Consider, Much Less Rule Out, Many Alternate Causes of Mr. Chappell's Renal Failure.

Plaintiff's proffered experts should be excluded under Federal Rule of Procedure

702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).  "[T]he

requirement of reliability found in Rule 702 [is] the centerpiece of any determination of

admissibility."  *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002).  Every

step of an expert's analysis must be supported by good grounds.  "*[A]ny* step that renders the

analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible*."

*McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005) (emphasis in original);

*accord Kilpatrick v. Breg, Inc.*, No. 08-10052-CIV, 2009 WL 2058384, at *3 (S.D. Fla. June 25,

2009) ("if the court determines that any step in the expert's chain of logic is unreliable, his entire

---

[6] Plaintiff also has designated a damages expert, Dr. Joe Gonzales, who testified that he is not offering a causation opinion.  Deposition of Joe Gonzales (Ex. J) at 11:11-14, 28:4-6.  Bayer is filing a separate motion to exclude Dr. Gonzales' damages opinion.

[7] Mr. Chappell contended in his Plaintiff Fact Sheet that Trasylol caused his post-operative stroke.  Plaintiff Fact Sheet (Ex. B) § VI.A.  Neither of his causation experts has offered an opinion in support of this claim.  *See* Hill Dep. (Ex. A) at 70:12-20; Blond Dep. (Ex. C) at 32:8-14.  To the extent Mr. Chappell seeks to pursue his stroke claim, Bayer is entitled to summary judgment because plaintiff has no medical evidence to support that claim.

opinion must be excluded"). Plaintiff's proffered experts failed to engage in a scientific specific-causation analysis to "rule in" and then "rule out" the multiple other potential causes of Mr. Chappell's alleged injuries. Accordingly, neither Dr. Blond nor Dr. Hill can reliably opine that Trasylol was a "substantial factor" in Mr. Chappell's claimed injuries, and their causation testimony must be excluded. *Guinn v. AstraZeneca Pharm.,* 602 F.3d 1245, 1253 (11th Cir. 2010); *McDowell v. Brown*, 392 F.3d 1283, 1300-01 (11th Cir. 2004); *United States v. Frazier*, 387 F.3d 1244, 1265 (11th Cir. 2004) (en banc).

Dr. Blond's report mentions only a handful of Mr. Chappell's pre-existing conditions: hypertension, chronic kidney disease, coronary artery bypass surgery, and use of nephrotoxic contrast dye. Blond Report (Ex. E) at 4-6. Similarly, Dr. Hill's report mentions only Mr. Chappell's obesity, diabetes, hypertension, chronic renal insufficiency, cerebrovascular disease, congestive heart failure, myocardial infarction, and use of contrast dye. Hill Report (Ex. F) ¶¶ 1-2. In formulating their litigation opinions, both doctors failed to analyze numerous other conditions that contributed to Mr. Chappell's risk for post-operative renal failure.

- **Risk Factors Considered by Neither Expert**

1) *Ejection Fraction of 45 Percent or Less.* During their depositions, both Dr. Blond and Dr. Hill acknowledged that Mr. Chappell had an ejection fraction of 45 percent or less when he appeared at the emergency room, and admitted that such an ejection fraction is a risk factor for renal failure. Blond Dep. (Ex. C) at 33:25-34:13; Hill Dep. (Ex. A) at 89:14-90:14, 93:22-25. Neither expert assessed or excluded the risk posed by Mr. Chappell's ejection fraction in forming his causation opinion. Blond Report (Ex. E) at 4-6; Hill Report (Ex. F) ¶¶ 6-8.

2) *COPD.* Both Drs. Blond and Hill acknowledged that COPD is a risk factor for post-surgery renal failure, Blond Dep. (Ex. C) at 37:20-38:4; Hill Dep. (Ex. A) at 94:17-21, but

did not exclude Mr. Chappell's COPD as a possible cause, *see* Blond Report (Ex. E) at 4-6; Hill

Report (Ex. F) ¶¶ 6-8.

       3)    *Prolonged Time on Bypass.*  Dr. Blond admitted that long cardiopulmonary

bypass is a risk factor for renal failure, Blond Dep. (Ex. C) at 41:8-12, but he did not analyze the

added risk associated with Mr. Chappell's prolonged surgery.  Instead, he discussed only the

general risks of bypass surgery, Blond Report (Ex. E) at 5-6 (explaining that "[t]he factors that

caused injury in Mr. Chappell may include coronary artery bypass surgery" and analyzing the

general risk of surgery).  Similarly, although Dr. Hill mentioned in passing the duration of Mr.

Chappell's bypass procedure in his report, Hill Report (Ex. F) ¶ 4, he did not evaluate whether it

could have played a role in Mr. Chappell's injury, *id.* at ¶¶ 6-8; *see also* Hill Dep. (Ex. A) at

98:20-101:10 (recognizing that prolonged time on bypass is a risk factor for renal failure).

       4)    *Prior Angioplasty.*  Dr. Blond testified that he was not sure whether a prior

angioplasty is a risk factor for renal failure: "I would think that there's probably a correlation

[between prior angioplasty and post-surgery renal failure] but I'm not sure of the literature on

that."  Blond Dep. (Ex. C) at 40:16-25.  He thus could not have ruled out that risk here.  Dr. Hill

testified that he knew of the risk posed by prior angioplasty, Hill Dep. (Ex. A) at 97:11-22, but

he did not exclude that risk in his report, Hill Report (Ex. F) ¶¶ 6-8.

       5)    *History of Tobacco Abuse*.  Neither expert ruled out Mr. Chappell's significant

history of tobacco abuse as a risk factor for renal failure.  *See* Blond Dep. (Ex. C) at 37:2-38:4;

Blond Report (Ex. E) at 4-6; Hill Dep. (Ex. A) at 116:25-117:9; Hill Report (Ex. F) ¶¶ 6-8.

       6)    *Age*.  Drs. Blond and Hill agreed that patients older than 70 have a greater risk of

renal failure following surgery, Blond Dep. (Ex. C) at 33:8-15; Hill Dep. (Ex. A) at 88:9-24,

92:21-93:11, but neither considered the risk posed by Mr. Chappell's age, *see* Blond Report (Ex. E) at 4-6; Hill Report (Ex. F) ¶¶ 6-8.

- **Additional Risk Factors That Dr. Blond Failed to Consider**

1)       *Diabetes*.  Dr. Blond acknowledged that Mr. Chappell had a history of diabetes, Blond Dep. (Ex. C) at 33:21-24, 109:22-25, and that diabetes increases the risk of renal failure following surgery, *id.* at 33:16-20.  But he did not consider or rule out the risk of post-surgery renal failure posed by Mr. Chappell's diabetes.  *See* Blond Report (Ex. F) at 4-6.

2)       *Myocardial Infarction and Congestive Heart Failure.*  Dr. Blond recognized that Mr. Chappell's chronic congestive heart failure and heart attack during the week before surgery represent risk factors for post-operative renal failure.  Blond Dep. (Ex. C) at 35:1-21; 36:23-37:2.  But he did not consider whether those conditions could have caused Mr. Chappell's renal failure.  Blond Report (Ex. E) at 5.  He did narrowly assess whether atrial fibrillation, another heart condition, could be associated with Mr. Chappell's kidney failure, but he did not rule out Mr. Chappell's history of heart problems or his acute cardiac injury shortly before his surgery.  *Id.*

3)       *Morbid Obesity.*  Dr. Blond recognized that Mr. Chappell was morbidly obese at the time of his surgery, and acknowledged during his deposition that morbid obesity is a risk factor for renal failure.  Blond Dep. (Ex. C) at 38:13-39:16.  However, he did not exclude the risk posed by Mr. Chappell's obesity in forming his causation opinion.  Blond Report (Ex. E) at 4-6.

**B.       Drs. Blond and Hill Base Their Opinions on Inadmissible *Ipse Dixit*.**

An expert opinion is "inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions."  *McDowell*, 392 F.3d at  1300; *see General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected

to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply

too great an analytical gap between the data and the opinion proffered.").  Dr. Blond and Dr.

Hill's opinions should be excluded because they rest on the witnesses' say so.

Dr. Blond acknowledged that he could not discern what role other underlying

conditions played in causing Mr. Chappell's injury:

> There's not a specific fact that I can say that clarifies which single cause or which
> mech — which cause was the cause, because there's multiple causes.  And there's
> – there's no way to delineate how much of [the injury] is related to Aprotinin,
> how much is related to blood pressure changes, how much is related to the cardiac
> bypass inflammatory response.  There's – how much is related to blood pressure
> medications.  There's multiple factors, and there's not one specific factor I can
> say is characteristic of any one of those items.

Blond Dep. (Ex. C) at 87:1-11; *see also id.* at 88:5-7 ("I can't tell you it's one specific cause,

because it isn't.")  The foundation of Dr. Blond's opinion is that he "would not have expected

[Mr. Chappell] to require dialysis" after surgery.  *Id*. at 102:3-7.  He bases this on the "clinical

course" of Mr. Chappell's kidney injury, claiming that a pattern of severe reduction of kidney

function on the second day after surgery suggests a Trasylol injury.  *Id.* at 87:22-88:14, 91:24-

92:3.  However, Dr. Blond also conceded that he does not know when Trasylol-based toxicity

would appear.  *Id.* at 90:25-91:4.  Accordingly, Dr. Blond's opinion is pure *ipse dixit*.

Dr. Hill's opinion also is *ipse dixit*.  He opines that Trasylol caused Mr.

Chappell's injury because "permanent [renal failure] is something that was unexpected in this

patient."  Hill Dep. (Ex. A) at 146:5-6.   When asked for the basis for this opinion, Dr. Hill

stated:

> I give that opinion based on the fact that, Number 1, this patient was given high-
> dose aprotinin.  Number 2, that it is pretty well established that aprotinin has
> nephrotoxic effect. … I would say that from my reading of the literature, that
> aprotinin most likely has nephrotoxic effect on every single patient.

18

*Id.* at 152:11-19.  Dr. Hill then conceded that he had not seen any study that suggested that, at the

doses used in clinical practice, aprotinin caused nephrotoxicity in all patients.  *Id.* at 155:7-13.

His opinion thus confuses general causation with specific:  in essence, Dr. Hill opines that

because Trasylol *can* cause renal injury, it therefore *did in this case.  See, e.g., McClain*, 401

F.3d at 1239 ("General causation is concerned with whether an agent increases the incidence of

disease in a group and not whether the agent caused any given individual's disease") (citation

omitted).  Dr. Hill believes that Trasylol caused Mr. Chappell's renal injury simply because

Trasylol was used, not because he ruled out other potential causes for injury in this specific

patient.  *See, e.g., Martin*, 561 F.3d at 443 (expert's opinion that every exposure to a toxin was a

substantial factor in causing injury was insufficient under Kentucky law because it would render

the substantial factor test meaningless).  His testimony must therefore be excluded.  Without the

testimony of either expert, plaintiff has no evidence that Trasylol caused his alleged injuries.

Bayer is therefore entitled to summary judgment.

**III.    ANY NON-WARNINGS THEORY ALSO FAILS AS A MATTER OF LAW.**

The crux of all plaintiff's claims is that Bayer failed to warn about renal failure.

Nevertheless, plaintiff nominally pleads theories concerning the design of Trasylol, breach of

warranty and unfair trade practices.

Under Kentucky law, a design defect claim is not distinct from a warnings claim.

The Kentucky Supreme Court has adopted the principle in comment k to Section 402A of the

Restatement (Second) of Torts that an unavoidably unsafe product that is properly prepared and

accompanied by proper directions and warnings is not defective or unreasonably dangerous.

*Larkin,* 153 S.W.3d at 761.  Stated simply, under Kentucky law, whether a prescription drug is

unreasonably dangerous is assessed based on the drug's warnings, and for the reasons shown above, plaintiff's warnings claims fail.  *Supra* § II.[8]

Plaintiff's warranty claims fail because he was not in privity with defendants. *Anderson v. Ridge Tool Co.*, No. 06-116, 2008 WL 1908716, at *7 (E.D. Ky. Apr. 30, 2008) (privity required for breach of warranty claims in products liability context); *Munn v. Pfizer Hosp. Prods. Group, Inc.,* 750 F. Supp. 244, 248 (W.D. Ky. 1990) (where plaintiff obtained product from hospital rather than manufacturer, there was no privity to sustain breach of warranty claim).

Plaintiff's claim of unfair trade practices fails because, under the Kentucky Consumer Protection Act, only buyers of goods for personal, family, or household purposes can sustain a claim for unfair trade practices, and plaintiff did not buy Trasylol.  *See* Ky. Rev. Stat. Ann. § 367.220; *see also Arsenault v. PNC Mortgage Corp.,* 32 Fed. App'x 739, 743-44 (6th Cir. 2002) (plaintiffs lacked claim under Kentucky Consumer Protection Act because they did not purchase from defendants).

## CONCLUSION

For the foregoing reasons, Dr. Blond and Dr. Hill should be precluded from offering expert testimony regarding specific causation, *see* Fed. R. Evid. 702, and summary judgment should be entered for Bayer.  Fed. R. Civ. P. 56.

## RULE 7.1(a)(3) CERTIFICATION

As required by this Court's Local Rule 7.1(a)(3), counsel for defendants hereby certifies that counsel for the defendants has made reasonable efforts to confer in good faith with

---

[8] Were these claims distinguishable from his warnings theories, they would still fail.  Plaintiff's design defect claim also fails because "design defect liability requires proof of a feasible alternative design," and plaintiff has identified no such alternative. *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 42 (Ky. 2004).

counsel for all parties who may be affected by the relief sought in the motion, and has been advised that plaintiff will contest this motion.

Dated:  July 6, 2010                               Respectfully submitted,

                                                   */s/ Barbara Bolton Litten*
                                                   Patricia E. Lowry
                                                   Florida Bar No. 332569
                                                   E-mail:  plowry@ssd.com
                                                   Barbara Bolton Litten
                                                   Florida Bar No. 91642
                                                   E-mail:  blitten@ssd.com
                                                   **SQUIRE, SANDERS & DEMPSEY L.L.P.**
                                                   1900 Phillips Point West
                                                   777 South Flagler Drive
                                                   West Palm Beach, FL  33401-6198
                                                   Telephone:  561-650-7200
                                                   Facsimile:   561-655-1509

                                                   Philip S. Beck
                                                   Email:  philip.beck@bartlit-beck.com
                                                   Steven E. Derringer
                                                   Email:  steven.derringer@bartlit-beck.com
                                                   **BARTLIT BECK HERMAN PALENCHAR**
                                                        **& SCOTT LLP**
                                                   54 W. Hubbard Street, Suite 300
                                                   Chicago, IL  60603
                                                   Telephone:  312-494-4400
                                                   Facsimile:  312-494-4440

                                                   Eugene A. Schoon
                                                   Email:  eschoon@sidley.com
                                                   Susan A. Weber
                                                   Email:  saweber@sidley.com
                                                   Tamar B. Kelber
                                                   Email:  tkelber@sidley.com
                                                   **SIDLEY AUSTIN LLP**
                                                   One South Dearborn Street
                                                   Chicago, Illinois 60603
                                                   Telephone:  312-853-7000
                                                   Facsimile:  312-853-7036

Susan Artinian
Email:  sartinian@dykema.com
Daniel Stephenson
Email:  dstephenson@dykema.com
**DYKEMA GOSSETT PLLC**
400 Renaissance Center
Detroit, MI  48243
Telephone:  313-268-9788
Facsimile:  313-568-6658

Richard K. Dandrea
Email:  rdandrea@eckertseamans.com
**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA.  15219
Telephone:  412-566-6000
Facsimile:  412-566-6099

*Attorneys for Bayer Corporation,*
*Bayer HealthCare Pharmaceuticals Inc.,*
*and Bayer Schering Pharma AG*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 6, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<u>*/s/ Barbara Bolton Litten*</u>
Barbara Bolton Litten

**SERVICE LIST**

**Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON**

James R. Ronca
Email: jronca@anapolschwartz.com
**ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN
     & SMALLEY, P.C.**
1710 Spruce Street
Philadelphia, PA 19103
Telephone: 215-790-4584
Facsimile:  215-875-7701
***Co-Lead Counsel for Plaintiffs***

Theodore Babbitt
Email: tedbabbitt@babbitt-johnson.com
**BABBITT JOHNSON OSBORNE
     & LECLAINCHE, P.A.**
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
Telephone: 561-684-2500
Facsimile:  561-684-6308
***Liaison Counsel for Plaintiffs***

George M. Fleming
Email:  George_Fleming@fleming-law.com
Karen Beyea-Schroeder
Email:  karen_beyea-schroeder@fleming-
law.com
Aaron Heckaman
Email:  aaron_heckaman@fleming-law.com
**FLEMING & ASSOCIATES LLP**
1330 Post Oak Blvd., Suite 3030
Houston, TX  77056
Telephone:  713-621-7944
Facsimile:   713-621-9638
***Counsel for Plaintiff Willard Chappell***

Scott A. Love
Email:  slove@triallawfirm.
**CLARK, BURNETT, LOVE & LEE, G.P.**
Lyric Center
440 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone:  713-757-1400
Facsimile:  713-759-1217
***Co-Lead Counsel for Plaintiffs***

Neal L. Moskow
Email: neal@urymoskow.com
**URY & MOSKOW, LLC**
883 Black Rock Turnpike
Fairfield, CT 06825
Telephone: 203-610-6393
Facsimile:  203-610-6399
***Federal-State Liaison for Plaintiffs and Counsel
for Plaintiff Willard Chappell***

Patricia E. Lowry
Florida Bar No. 332569
Email: plowry@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone:  561-650-7200
Facsimile:  561-655-1509
***Liaison Counsel for Defendants***